US District Court for the Middle District of TN

FILED
2016 FEB 16 AM 11: 27
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

) Craig Cunningham

) Plaintiff, pro se

)

) v.

3:16-0222

**CIVIL ACTION NO.**

)

) Shoutpoint, Inc., Michael Montes, Tollfreezone.com, Inc., Shoutpoint, Inc., James Christiano, Jeff Brian Zink

)

) Defendants

## Plaintiff's Original Complaint

1. The Plaintiff in this case is Craig Cunningham, a natural person and was resident of Davidson County at all times relevant to the complaint, and currently has a mailing address of 5543 Edmondson Pike, ste 248, Nashville, TN 37211

2. Shoutpoint, Inc., is a California Corporation operating from 4695 Macarthur Court, ste 930, Newport Beach, CA 92260 and can be served by registered agent/CEO James Christiano at the same address as above.

3. James Christiano is a natural person and CEO of Shoutpoint, Inc., and can be served at 4695 Macarthur Court, ste 930, Newport Beach, CA 92260. Hereaftter, the Plaintiff shall refer to Shoutpoint to mean Defendant Shoutpoint and James Christiano.

4. Michael Montes is the CEO of Tollfreezone.com, Inc., a currently suspended corporation that is still operating by Michael Montes and can be served at 26961 Via La Mirada, San Juan Capistrano, California 92675. Hereafter, the Plaintiff shall refer to Defendant Montes to mean both Michael Montes and Tollfreezone.com, Inc.

5. Tollfreezome.com, Inc., is a suspended California corporation that is still being operated by Michael Montes and can be served via corporate officer Michael Montes at 26961 Via La Mirada, San Juan Capistrano, California 92675.

6. Jeff Brian Zink is a natural person, a California resident living from 8160 N. Lake Dr., Apt A, Dublin, CA 94568. Hereafter, the Plaintiff shall refer to Tel-server to mean both Jeff Zink and Tel-server to the extent that it is a legal entity.

## Jurisdiction

7. Jurisdiction of this court arises as the defendants continuous and systematic contacts within the state of Tennessee in placing numerous phone calls to consumers in the state of Tennessee as part of a robocall marketing campaign in which tens of thousands of phone calls were made to consumers across the country. Subject matter jurisdiction is apparent as the TCPA is a federal question under 28 USC 1331.

8. Specific personal jurisdiction is apparent for the defendants as the claims rise out of and are related to the contacts by the defendants to the Plaintiff residing in Tennessee, including but not limited to committing tortious conduct within Tennessee, causing injury to Tennessee residents arising out of acts and omissions

comitted while engaged in solicitation and service activities within Tennessee. By directing tens of thousands of auto-dialer initiated phone calls into Tennessee, the Defendants had sufficient minimum contacts with Tennessee that it should reasonably be anticipated in being sued in Tennessee for claims rising out of or relating to those contacts.

9. Venue in this District is proper as the defendants are subject to personal jurisdiction based on the continuous and systematic contacts within the forum state of Tennessee. The telephone calls which led to the violations of alleged here occurred in Tennessee. The Defendants made multiple unsolicited telephone calls to the Plaintiff and other Tennessee residents living in Tennessee.

## FACTUAL ALLEGATIONS

10. In 2015, the Plaintiff received multiple automated phone calls with a pre-recorded message to the Plaintiff's cell phone, which was 615-348-1977. These calls were clearly automated and made by an automated telephone dialing system as defined by 47 USC 227(a)(1), which can store or produce telephone numbers to be called using a random or sequential number generator. Additionally, the calls contained a pre-recorded message. The calls were not for an emergency purpose and were placed without the Plaintiff's prior express written consent.

11. These calls related to new student loan consolidation scam where con artists pretend to be affiliated with the US department of Education and offer "document preparation" services at an inflated rate, which in reality is nothing more than consolidating a person's Federal student loans which can be done for free online

and takes about 15 minutes. For these "services", there would have been a charge of $599.

12. The calls contained a pre-recorded message that said *"If your student loan is in a default or collection status, help is available now. To see if you are eligible for the new student loan forgiveness program, press 1 now. Your payments may be reduced by up to 75%."*

13. When the Plaintiff connected to a representative, he discussed the his student loans and was quoted $599 to consolidate them.

14. Mike Moretti admitted to the Plaintiff that the calls were made using an automated telephone dialing system and contained a pre-recorded message as defined by the TCPA, 47 USC 227.Mike stated that he purchased leads for the calls and didn't have the Plaintiff's express written consent to call.

15. The Plaintiff received the following phone calls, all of which the Plaintiff alleges were placed by an automated telephone dialing system as described by the TCPA, 47 USC 227 to his cell phone, 615-348-1977 on the following dates, which the Plaintiff notes is not a complete listing of the calls are absolutely more calls than this initial list, which should be obtainable in discovery:

16. on 4/1, from 424-488-7138 to 615-212-9191

17. on 3/31, 4/1, three times, 4/6, 4/8, 4/10, from 929-249-2850

18. on 3/30, 4/1, 4/9 three times, and 4/14 from 310-906-5440 to 615-212-9191 at

19. At a minimum, these are the calls at issue, and the Plaintiff is alleging a total of 16 non-compliant telephone calls by the Defendants. The Plaintiff is in the process of researching other calls.

20. For the calls to be compliant, the Defendants would have had to obtained the Plaintiff's signature clearly and unambiguously authorizing automated/pre-recorded calls to the Plaintiff's cell phone for the calls to be permitted under the law, and the Plaintiff has signed no such document for any of the defendants.

**Automated Calls were Placed by Michael Montes Controlled Entities**

21. Upon further inquiry and research, it was disclosed by the manager of the entity, Mike Moretti that the dialing company he used operated a website www.Tel-server.com. The registrant for that website appears to be Jeff Brian Zink who is one person in a chain of several that are responsible for the initiation of the calls to the Plaintiff. Jeff Zink is therefore jointly and severally liable for each and every call placed to the Plaintiff.

22. The Plaintiff tracked the calls back to a Michal Montes Controlled entity and website: www.rainmakercalls.com through information gleaned from the Tel-server.com website, which state the web management system is www.rainmakercalls.com

23. Jeff Zink was actually using a platform owned and operated by Michael Montes and the Montes Entity, Tollfreezone.com, Inc., which is www.rainmakercalls.com to initate the calls to the Plaintiff. This makes Michael Montes jointly and severally liable for the calls in question.

24. Michael Montes is the driving force for millions of automated calls with pre-recorded messages through his entity, Tollfreezone.com, Inc., and caters specifically to individuals engaged in MLM, pyramid schemes, and as such does not hold itself out indifferently to all its customers. Michael Montes was highly involved and personally participated and authorized the conduct in the illegal telephone calls going to the length of conducting training videos on how to make illegal calls and regularly offering and making himself available to individuals wishing to make illegal calls.

25. Furthermore, Michael Montes knew what he was doing was illegal as he has repreatedly been the recipient of sanctions from Attorney Generals and state regulatory agencies for making illegal telephone calls, for example, Missouri's Attorney General in 2012 filed suit against Tollfreezone.com, Inc., for violating the state's Do-not-call provisions and the Mississippi Public Service Commission in 2012 announced a $440,000 fine against Tollfreezone.com, Inc., for violating the Mississippi no-call law 88 times by making unauthorized telephone solicitations and refusing to purchase the state's do-not-call list.

26. Finally, upon even further research, the Plaintiff learned that Michael Montes is actually a reseller of the Platform he is using for www.rainmakercalls.com, which is actually owned/operated by Shoutpoint, Inc., which is the actual party that initiated the automated calls to the Plaintiff's cell phone.

**Automated calls were placed by Shoutpoint to the Plaintiff's cell phone.**

27. Shoutpoint is a telecommunications company that offers voicebroadcasting services aka robocalling/robodialing or legally speaking automated telephone dialing systems as defined by the TCPA, 47 USC 227.

28. Shoutpoint.com appears to be the genesis of these illegal telephone calls, and Shoutpoint caters to and advertises to individuals wishing to place automated calls to consumers offering to *"Create, deliver and monitor customized messages to your constituency at alarming rates"* and advertising their scalability by stating *"Do you need to get 1M (million) calls out in an hour? No problem."* indicating they can rapidly pump out 16,666 calls every minute. Shoutpoint initiated all of the illegal telemarketing calls to the Plaintiff and allowed the illegal calls to take place with full knowledge that they were happening.

29. Shoutpoint is keenly aware of the illegal use of their platform and has allowed Montes to use it for years illegally going back at least to 2013 or roughly around the time Michael Montes has multiple Attorney Generals are regulatory agencies after him. Therefore, Shoutpoint has exercised a high degree of involvement in the illegal activity.

30. Shoutpoint has also been put on notice of the illegal use of their services, but instead of seeking more information, conducting an inquiry or investigation into the matter, or prohibiting the offender from making any more illegal calls, Shoutpoint hired a lawyer J. Douglas Shepherd on February 10th 2015, to write the Plaintiff a letter alleging that the Plaintiff is misinformed and simply denying that Shoutpoint had done anything wrong. No mention was made of the Plaintiff's

complaint or illegal calls to the Plaintiff's cell phone through the Shoutpoint platform other than effectively saying *"we didn't do it"*

31. The Plaintiff gave Shoutpoint his phone number where he was recieving phone calls and the timeframe for which the calls were coming in, and every agent/employee of Shoutpoint from the CEO down refused to speak with the Plaintiff and were all apparently notified that if the Plaintiff called to mindlessly repeat *"Please refer to the letter we sent you"* and other statements from agents of Shoutpoint include *"In that letter, we explain our stance on this"* and *"I'm sorry, there's nothing else I can help you with"* in response to the Plaintiff's complaint that their system was being used to place multiple illegal telephone calls.

32. The Plaintiff had one phone call with J. Douglas Shepherd, attorney for Shoutpoint which lasted just over 1 minute, in which J. Douglas Shepherd ended the call stating *"Don't waste my time"* in which the Plaintiff's complaint and the non-responsive letter were discussed.

33. In sum, in response to complaints of rampant illegal use of their platform, Shoutpoint did made no inquiry, no investigation, sought out no further information from the Plaintiff, indeed refused to talk to the Plaintiff regarding the illegal calls, told every employee in the company to repeat to the Plaintiff *"refer to the letter"*, hired a lawyer to tell the Plaintiff that they did nothing wrong, and the lawyer's response that his client was facilitating illegal conduct and turning a blind eye to it was to respond with *"don't waste my time"*.

34. *"Don't waste my time"* is how Shoutpoint responds to complaints of illegal use of their platform. *"I'm sorry, there's nothing else I can help you with"* is how Shoutpoint responds to complaints of illegal use of their system.

35. Most telling, Shoutpoint took no adverse action against the individuals that continue to make large scale illegal telemarketing calls for which they pay Shoutpoint money and have done so for years. Shoutpoint doesn't want a record that they were informed of illegal use of their system (although the Plaintiff believes Shoutpoint knows all too well the individuals who are placing the illegal calls) and by refusing to speak to the Plaintiff are seeking to avoid any any further documentation of complaints of illegal use or identification of the individuals using their service illegally, so they can maintain the ruse and feign ignorance that they had no idea their system was being used illegally. Even when the Plaintiff told them he had the individuals on video tape making illegal calls using the Shoutpoint platform, Shoutpoint wasn't interested in seeing the video.

36. Shoutpoint does not hold itself out to the public serve all potential users, but rather seeks out a select clientle. Shoutpoint seeks out individuals that want to make illegal robocalls and does not offer this service to the general public. Furthermore, within this category, Shoutpoint is biased in favor of any seek to protect the individuals making illegal telemarketing calls.

37. Furthermore, Shoutpoint's "Circling of the wagons" in the face of the Plaintiff's complaint shows that they are protecting and defending individuals they know are making illegal calls because the business is too good to do otherwise

demonstrating a preferential bias towards individuals who will use their platform illegally.

38. Shoutpoint failed to give any notification to any entities about the requirements and include a citation to 47 CFR 64.1200 and 16 CFR 310. This violates 47 CFR 64.1200(g)

39. Shoutpoint has shown a high degree of involvement in these illegal automated calls and given actual notice of the unlawful activity failed to take steps to prevent the unlawful transmissions.

40. Shoutpoint lacks an acceptable use Policy and has no policy to deal with illegal use of their platform. Shoutpoint lacks any sort of policies or practices to detect and prohibit unlawful, fraudulent or abusive use of their services. Instead, Shoutpoint considers this not their problem and is all too willing to allow this illegal conduct to continue.

41. Shoutpoint has no "acceptable use policy", which is a standard element for Common Carriers, such as ATT. In another letter to the Plaintiff, J. Douglas Shepherd claimed that Shoutpoint is just like AT&T in that they just transmit calls from one party to another across the AT&T network stating *"There might be something allegedly wrong with the calling activity, but it is the fault of the person initiating the calling activity, rather than AT&T who is to blame"*.

42. This example is correct with regards to AT&T only because AT&T has an acceptable use policy and actually responds to complaints regarding abusive and

illegal use of their services[1]. AT&T doesn't take the Ostritch approach, like Shoutpoint of sticking their head in the sand and pretending that the illegal conduct/complaints aren't happening. AT&T doesn't tell consumers complaining of abusive calls through the AT&T network *"Don't waste my time"* or *"I'm sorry, there's nothing else we can help you with"*.

43. By comparison, Shoutpoint has no acceptable use/responsible use policy, at all, therefore anything and everything goes, legal or not, as far as using Shoutpoint's platform, which is clearly indicated by the responses from Shoutpoint and their lawyer.

44. In fact, Shoutpoint goes into protection mode and seeks to prevent/stifle complaints and turns a blind eye to illegal conduct to protect the entity placing the illegal calls. If someone is using AT&T services to make harassing or annoying illegal telemarketing calls, AT&T has a robust policy prohibiting illegal conduct, multiple email addresses and phone numbers to call to complain to, and a policy of taking action from warnings to suspension of the accounts engaging in the illegal behavior.

45. In contrast, Shoutpoint, Inc., has no prohibitions whatsoever on illegal or harassing calls being made across the Shoutpoint network, no number or email to direct complaints to, and if you call in to complain to Shoutpoint, they will just tell you to stop wasting their time, that Shoutpoint didn't do anything wrong and refuse to take your calls or speak to you in the future regarding the matter.

---

[1] http://www.corp.att.com/aup/

46. If the Plaintiff wanted to use ShoutPoint's platform to allow 30 year old men to chat up 12 year old girls, Shoutpoint would have no issues with that and take no action to prevent it. AT&T has a policy prohibiting inappropriate contact with minors. If the Plaintiff wanted to use ShoutPoint's platform to make millions of harassing phone calls, Shoutpoint would have no issues with that and take no action to prevent it. AT&T has a policy prohibiting unlawful activities.

47. Most telling and one of the key differences is that ATT reserves the right to act immediately to suspend or terminate affected IP services when it determines that it may expose AT&T to civil action or other liability. Shoutpoint, by comparison will do nothing.

48. Shoutpoint has actual knowledge of the misuse of their platform and is keenly aware of who is making them the most money as well as the nature of the usage of their network. Shoutpoint would obviously know and value accounts that are continually making hundreds of thousands of calls every day across the country, like Michael Montes and value that regular, steady income. The usage is very different than say an emergency school message that might go out a few times per month to a few hundred parents in the same area code.

49. Shoutpoint's CEO is responsible for allowing these practices to happen at his company. Shoutpoint's CEO has direct personal participation in both the company's willful blindness to the illegal telemarketing going on through their platform as well as the company's response to the Plaintiff's complaints regarding illegal usage of their platform. The Plaintiff asked to speak with the CEO by

name, and the CEO refused. The CEO knew of the Plaintiff's complaints of illegal conduct, and instead of investigating the complaints, he chose to ignore them and instructed the staff to not speak with the Plaintiff anymore as opposed to seeking out more information on the illegal conduct. ShoutPoint's CEO is personally liable for the TCPA violations occuring through his platform.

### Vicarious Liability for 3rd party Calls

50. Courts have addressed the practice of using 3rd parties to violate the law on an entities behalf and concluded under the TCPA that liability attaches to the party who benefits from the calls or on whose behalf the calls are being placed. To rule otherwise would be cause the TCPA to lose its deterrent effect *"If a company were to be allowed to avoid TCPA liability by merely hiring a different company to make its unlawful calls, the statute would lose its deterrent effect. Vicarious liability prevents this liability maneuvering."*[2]

51. Indeed, courts have concluded that it would be absurd for a party to avoid liability by hiring someone to break the law on their behalf. *"To offer an example, suppose that A, a well-heeled entity that wants to sell a product or service, stands next to B, an impecunious defendant, and directs B to place unsolicited, prerecorded calls to consumers on their cell phones. Defendants' position, it appears, is that only B, the impecunious dialer, would be liable and that A would get off scot-free. A Congressional enactment that permitted this would be absurd indeed. Fortunately that is not the law under the TCPA."*

---

[2]see Bank v. Caribbean Cruise Line, Inc., No. 12–CV–584 (JG)(VS), at 22–23, ECF No. 49

# All the Defendants are liable for any 3rd party calls under the doctrine of actual authority.

52. In this case, each of the defendants entered into contractual relationships with each other. The student loan company contracted with Tel-server, Tel-server contracted with Michael Monte's or the company under his control, and Michael Montes contracted with Shoutpoint, Inc., to obtain automated telephone dialing capabilities.

53. An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act.

54. In this case, Tel-server was acting on behalf of Tollfreezone.com/Michael Montes, as they reasonably would have done by placing telephone calls on behalf of Tel-server. Michael Montes/Tollfreezone.com was acting on behalf of Shoutpoint, Inc., placing telephone calls as requested by Michael Montes.

55. A finding of actual authority requires a manifestation by the principal that the agent shall act for them.

56. In this case, that manifestation is found in the contract for telemarketing between the defendants.

57. Lastly, there is an understanding that the principal is in control of the undertaking, which is agreed upon in the contract for services between Defendant Tel-server and Montes and Montes and Shoutpoint and each master in the agreement could

certainly stop or control the telemarketing efforts being done on their behalf if they chose to do so.

### Defendants are liable for the 3rd party calls placed on their behalf under the doctrine of Apparent Authority.

58. According to the FCC, there are several examples of evidence that might be relevant in a finding of apparent authority: 1. Access to detailed information regarding the nature and pricing of the seller's products and services 2. the ability by the outside sales entity to enter consumer information into the seller's sales or customer systems 3. the authority to use the seller's trade name, trademark, and service mark, and 4. that the seller approved, wrote or reviewed the outside sales entity's telemarketing scripts and 5. if the seller knew or should have known that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to stop. [3]

59. In this case, a finding of Apparent authority is easy to determine as the outside sales entity (Montes/Tel-server) had the ability to directly enter consumer information into the agents computer systems to deliver calls to the Plaintiff.

60. Furthermore, in the calls, the agents had detailed information about the pricing an nature of the phone services offered by Montes and Shoutpoint, Inc.

61. Defendant Montes/Tollfreezone.com, Inc. knew of, wrote, and approved of the pre-recorded messages and telemarketing scripts used on their behalf by Defendant Tel-server.

---

[3] see Makaron v GE Sec. Mfg. Inc., not reported in F. Supp. 3d (2015) citing Dish 2 FCC Rcd at 6592.

62. Additionally, the Defendants knew or should have know that the telemarketers were violating the law and failed to take steps to force them to stop. Defendant Shoutpoint instead took steps to silence and deliberately avoid the Plaintiff's complaints or further information regarding it and took no action in response to the Plaintiff's complaints. Michael Montes has already been admonished multiple times by attorney generals and state regulatory bodies for illegal telemarketing, so he just doesn't care about engaging in illegal conduct. Similarly, Tel-server knew what they were doing was illegal but didn't care.

**Defendant RCF is liable for calls placed by 3rd parties on their behalf under the concept of Ratification.**

63. Defendants celebrated the conduct and ratified the conduct of the 3rd party telemarketers by celebrating the calls and rewarding them for generating leads and business with tens of thousands of dollars in payments and years long business relationships

64. The calls by the defendants violated 47 USC 227(b) entitling the Plaintiff to a recover of $1500 for making calls using an automated telephone dialing system and containing a pre-recorded message and 47 USC 227(c)(5) as codified by 47 CFR 64.1200 under the FCC's rulemaking authority entitling the Plaintiff to an additional recovery of $1500 for violating 47 CFR 64.1200(b) for failing to state at the beginning of the message the identity of the business making the call and during the message stating the telephone number of the business making the call, and 47 CFR 64.1200(d) by failing to have a written policy on maintaining a do-

not-call list and failure to train personnel on telemarketing. Defendant Shoutpoint is liable for all TCPA violations they allowed to occur on their platform.

### Actual Damages

65. The Plaintiff alleges actual damages have been incurred in this case. The repeated and unwelcome phone calls constitue a common law invasion of privacy claim against the defendants as the Plaintiff has a right to be left alone and by making repeated unsolicited calls to the Plaintiff, particularly after being sued, infringes on that right to be left alone.

66. The conduct of the defendants has resulted in the intentional infliction of emotional distress to include, trouble concentrating, frustruation, inconvenience, stress, and annoyance.

67. The Plaintiff also alleges that the fact that he must sue and engage in these legal proceedings to recover damages for the previous phone calls to constitute additional damages to include frustruation, inconvenience, stress, and annoyance.

### CAUSES OF ACTION:

### COUNT I

### Violations of the Telephone Consumer Protection Act (TCPA)

68. Plaintiff Cunningham incorporates by reference all of the above paragraphs of this complaint as though fully stated herein.

69. The foregoing actions by the Defendants constitute multiple breaches of the TCPA by placing calls with pre-recorded/automated messages to the Plaintiff's cell phone that lacked the name or address of the entity placing the phone calls in violation of 47 USC(c)(5) as codified by the FCC's rulemaking under 47 CFR 64.1200(d)(4), 47 CFR 64.1200(b), and 47 CFR 64.1200(c)

## CAUSES OF ACTION:

## COUNT II

### Violations of the Telephone Consumer Protection Act (TCPA)

70. Plaintiff Cunningham incorporates by reference all of the above paragraphs of this complaint as though fully stated herein.

71. The foregoing actions by the Defendants constitute multiple breaches of the TCPA by placing unsolicited and unwelcome telephone calls to the Plaintiff's cell phone. These phone calls also violated the TCPA by having an pre-recorded message in violation of 47 USC 227(b)

## 72. CAUSES OF ACTION:

## COUNT III

### Invations of Privacy and Intentional infliction of Emotional Distress

73. Plaintiff Cunningham incorporates by reference all of the above paragraphs of this complaint as though fully stated herein.

74. The foregoing actions by the Defendants constitutes common law invasion of privacy and intentional infliction of emotional distress.

## PRAYER FOR DAMAGES AND RELIEFS

A. WHEREFORE, Plaintiff, Cunningham, respectfully prays and requests that judgment be entered against each and every defendant for the following:

B. Statutory damages of $3000 for each phone call.

C. Actual damages of $100,000

D. Pre-judgment interest from the date of the phone calls.

E. Attorney's fees for bringing this action; and

F. Costs of bringing this action; and

G. For such other and further relief as the Court may deem just and proper

I, Craig Cunningham, Affiant, hereby attest to and certify that the facts contained in the foregoing complaint are true and correct to the best of my knowledge, information and belief and that a true and correct copy of the foregoing was sent to the defendants in this case,

Respectfully submitted,

Craig Cunningham, Plaintiff, Pro-se, 2/13/2016

**Mailing address:**

5543 Edmondson Pike, ste 248 Nashville, TN 37211 **Ph:** 615-348-1977

Extremely Urgent

Visit **ups.com**® or call **1-800-PICK-UPS**® (1-800-742-5877)
to schedule a pickup or find a drop off location near you.

**Domestic Shipments**
- To qualify for the letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
- The UPS Express Envelope is not recommended for shipments of electronic media containing sensitive personal information or cash equivalent. Items of value should be sent in a traceable manner. Do not send cash.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

Note: Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or cash equivalent. Do not send cash.

**Reusable Express Envelope Letter Size**

Reduce paper waste by using this envelope a second time either to return to sender or to ship to another recipient. See reuse instructions on flap above.

**Decision Green**℠

Decision Green is UPS's environmental platform, reflecting our pursuit of sustainable business practices worldwide. For example, this envelope is made from 100% recycled material and is both reusable and recyclable.

♲ 100% Recycled fiber
80% Post-Consumer

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

010195112 01/10 BL United Parcel Service, Louisville, KY

---

US DISTRICT COURT
801 BROADWAY
NASHVILLE TN 37203-3811

P: WHITE    S: BW2    I: SQU
AMIL - 8230
1Z760X14018011    2198    1030
TEN2BJB    THHH1186
US 3722    HIP 15.9.3    FEB 16 06:46:56 2016
ZEBRAZH400

CRAIG CUNNINGHAM
(615) 348-1977
5543 EDMONDSON PIKE
STE 248
NASHVILLE  TN 37211-5808

SHIP  US DISTRICT COURT
TO:   801 BROADWAY
      NASHVILLE TN 37203-3804

SHP WT: 1 LBS      LTR 1 OF
DATE: 15 FEB 2016

UPS NEXT DAY AIR
TRACKING #: 1Z 760 X14 01 8011 2198

TN 371 9-02

BILLING: P/P

ISH 13.00N ZZP 45B 72.5U 01/2015

This envelope is for use with the following services:
UPS Next Day Air®
UPS Worldwide Express®
UPS 2nd Day Air®

Do not use this envelope for:
UPS Ground
UPS Standard
UPS 3 Day Select®
UPS Worldwide Expedited®

Apply shipping documents on this side.

RECEIVED
IN CLERK'S OFFICE
FEB 16 2016
U.S. DISTRICT COURT
MID. DIST. TENN.